UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TAYYIB BOSQUE, CORP.,

                        Plaintiff,

- against -

EMILY REALTY, LLC, and JOSEPH LaFRIEDA,

                        Defendants.

**OPINION AND ORDER**

17 Civ. 512 (ER)

Ramos, D.J.:

      Tayyib Bosque, Corp. ("Plaintiff") is a New York company, represented by Tayyib Bosque ("Bosque"), a New York real estate and business broker. Defendants are Emily Realty, LLC ("Emily Realty"), a Nevada company registered to do business in New Jersey before it was dissolved, and Joseph LaFrieda ("LaFrieda"), a Texas resident, who at all times relevant to this action lived in New Jersey (collectively, "Defendants"). Bosque alleges that he found a buyer for three businesses owned by the Defendants in New Jersey and that Defendants breached their contract by selling to a different buyer and refusing to pay Bosque a commission. Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Doc. 29. For the reasons set forth below, Defendants' motion is GRANTED.

**I. BACKGROUND**

    **A. Bosque's Brokerage Services[1]**

      Bosque and LaFrieda worked together once before, sometime between 2005 and 2014, when Bosque unsuccessfully attempted to raise capital to refinance a property owned by LaFrieda. Ex. E, LaFrieda's Deposition 33, Doc. 29. In March 2015, Bosque called LaFrieda

---

[1] Unless otherwise noted, there is no dispute as to the following facts.

and asked him for a loan in connection with Bosque's wine business. Ex. 2 ¶ 9, Doc. 33 (Bosque claims it was an investment, not a loan). LaFrieda said no but agreed to retain Bosque as a "business-broker/finder" to sell two residential care homes and a boarding house, where residents rented rooms (the "Properties") that LaFrieda owned in New Jersey. Amend. Compl. ¶ 12, Doc. 30. Relevant to the analysis, Bosque is not licensed in New Jersey. The Agreement included the sale of both the three businesses and the real property on which they were located.

Bosque drove to New Jersey in the beginning of 2015 to meet with LaFrieda about selling the Properties. Ex. E, LaFrieda's Deposition 34, Doc. 29. Subsequently, Bosque drove to New Jersey again to inspect the Properties and explored other locations to do market price research. Bosque also took at least three potential investors to view the Properties. *Id*. at 59, 61. The potential buyers requested financial documents for the Properties, including tax returns, profit and loss ("P&L") statements, and proof of the social security deposits that covered the tenants' rent. Ex. F, Text Messages ¶ 432, Doc. 29. In approximately March 2016, one of these potential buyers, Steven Rosenburg ("Rosenburg"), made an offer of $5 million for the three Properties. Amend. Compl. ¶ 15, Doc. 30. Bosque negotiated an additional payment from Rosenburg of $50,000 to cut other buyers out of the deal; facilitated the negotiation of contract terms, like the closing timeline and whether the buyer could have a mortgage contingency; and managed the logistics of when the deposit and contract would be executed, etc. *See, e.g.*, Ex. 16, Email, Doc. 33 (Bosque says that he "accepted the offer" from Rosenburg on LaFrieda's behalf).

On March 18, 2016, Bosque told LaFrieda that he was owed a $500,000 commission because of Rosenburg's $5 million offer. Ex. F, Text Messages ¶ 42, Doc. 29. Bosque alleges that on March 22, 2016, he and LaFrieda formed a written, binding agreement over text

messages establishing that his commission was $500,000. Amend. Compl. ¶ 18, Doc. 30. Specifically, Bosque relies on the following exchange:

> Text from Bosque: And I'm drawing up a fee agreement between you and I, in the amount of $550k.
>
> Text from LaFrieda: 500k like we agreed. Don't be greedy.

*Id*. ¶ 85-86. The next day, on March 23, 2016, the two had a similar text exchange that Bosque alleges confirms their understanding:

> Text from Bosque: I'm giving you a fee agreement for $550.. before you get contract I'm not stupid. $500 I earned $50 you owe me for the deal!
>
> Text from LaFrieda: Beat it. 500k. You owe me.
>
> Text from Bosque: Ok don't drive me crazy….

*Id*. ¶ 114–16. On April 4, 2016, Bosque reiterated that he needed to draw up a fee agreement and that the extra $50,000 was his because Rosenburg agreed to pay the additional amount in exchange for Bosque cutting other potential buyers out of the deal. *Id*. ¶ 192. On April 25, 2016, Rosenburg sent LaFrieda a $250,000 deposit by wire and asked for the Properties' tax returns, P&L statements, and social security deposit receipts. *Id*. ¶ 432. But LaFrieda balked at some of the terms Rosenburg proposed, including 150 days for closing and a mortgage contingency. Ex. E, LaFrieda's Deposition 98–99, Doc. 29. Bosque urged LaFrieda via a text dated April 25, 2016, to reach a decision on the deal with Rosenburg, and apparently acknowledged that his entitlement to the commission depended on closing the deal with Rosenburg: "Listen, close the deal you owe me $500k my money. Don't close send deposit back you owe me nothing…." Ex. F, Text Messages ¶ 448, Doc. 29.

Even as the contract negotiations between Rosenburg and LaFrieda were going on, LaFrieda—with Bosque's knowledge— was also working with another broker and entertaining offers from other buyers. On March 28, 2016, LaFrieda sent Bosque a screenshot of an email regarding financing for a buyer named Raj, who had been referred by the other broker. *Id*. ¶ 142, Doc. 29. LaFrieda wanted to close the deal quickly and told Bosque that the first one with a contract and a deposit "wins." *Id*. ¶¶ 94, 143.

The parties have submitted two different versions of the of the agreement between LaFrieda and Rosenburg. The version submitted by LaFrieda, names "Steven Rosenburg" as the buyer but is not executed by any party. Ex. I, Doc. 29. The version submitted by Bosque is identical except that it names Emerald Realty Associates, LLC, Rosenburg's business entity, as the buyer and is purportedly signed by Rosenburg but not by LaFrieda.[2] Ex. 10, Doc. 33. Bosque also submitted an April 28, 2016 email that attaches a PDF labeled "Meadowview" (the name of one of the Properties) from Rosenburg's attorney to LaFrieda's attorney and asserts that this PDF contained the signed contract. Ex. 12, Doc. 33; Ex. 2 ¶ 110, Doc. 33. The agreements show that Emily Realty was to convey both the real property and business assets of the Properties. *E.g.*, Ex. 10, Signed Contract § 1(a)-(f), Doc. 33. Section 11 of the contract, titled "Brokers," listed Bosque as the broker and provided that LaFrieda would pay him at closing:

> **Seller shall pay Broker at time of closing.** Buyer and Seller mutually represent to each other that no broker or realtor was involved in bringing about this Agreement or the conveyance of the Property to Buyer pursuant hereto except Tayyib Bosque, Tayyib Bosque Corp., Licensed Real Estate Sales Person Lic # 10401255692, Phone 917-653-5833, Fax:  888-468-3491, email:  pbosque@gmail.com.

---

[2] Bosque also submitted a draft of the Agreement with handwritten notes, which do not affect the analysis. *See* Ex. 9, Doc. 33.

*Id*. § 11 (emphasis in original). Rosenburg's signature was not dated and there was no accompanying witness signature. *Id*. The signature page on the version submitted by Bosque was a darker color than the rest of the contract and was oriented upside down.[3] *Id*.

On May 2, 2016, Bosque again asked LaFrieda for the financial documents because Rosenburg was expecting them. *Id*. ¶ 547–48. But LaFrieda told him that his lawyer was going to wire the deposit back to Rosenburg and to not bother him anymore. *Id*. ¶ 549. LaFrieda ultimately sold the Properties to Raj for $4 million. Ex. E, LaFrieda's Deposition 50, Doc. 29. Bosque alleges that he performed under his agreement with LaFrieda by procuring a buyer and that LaFrieda failed to perform his promise to sell the Properties to Rosenburg and pay Bosque for his services. Amend. Compl. ¶ 29–37, Doc. 30. He further contends that LaFrieda was unjustly enriched by these services, that there was an implied contract between the two, and that LaFrieda committed fraud by backing out of the contract with Rosenburg. *Id*. ¶ 38–60. Finally, Bosque asks this Court to pierce the corporate veil as LaFrieda was the sole member of Emily Realty before it was dissolved. *Id*. ¶ 90–98.

## II. PROCEDURAL BACKGROUND

Bosque filed the instant action on January 24, 2017. Doc. 1. The Defendants filed a motion to transfer the case to the District of New Jersey on February 21, 2017. Doc 8. On February 23, 2017, this Court issued a stay pending the Court's resolution of the motion. Doc. 9. After conducting a hearing, this Court denied the motion to transfer and lifted the stay on March 5, 2018. Doc. 15. On August 31, 2018, LaFrieda filed a motion for summary judgment, Doc. 29; on that same day, Bosque filed an Amended Complaint. Doc. 30. The Amended Complaint

---

[3] LaFrieda disputes the authenticity of this signed contract; he claims that the first time he saw it was during discovery for the instant case. Ex. 3, Reply Decl. of Joseph LaFrieda ¶ 4–5.

asserts five causes of action: (1) breach of contract, (2) breach of implied contract; quantum meruit, (3) unjust enrichment, (4) fraud, and (5) a claim for piercing the corporate veil. *Id.* ¶ 32–98. On October 3, 2018, Bosque filed an opposition to the motion for summary judgment. Doc. 33. On October 19, 2018, LaFrieda filed a second motion for summary judgement that included a response to Bosque's 56.1 Counter-Statement. Doc 36. LaFrieda filed his Reply memorandum on November 19, 2018. Doc. 41.

### III. MOTION FOR SUMMARY JUDGMENT

**A. Standard of Review**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is initially responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Rather, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68.

**B. Choice of Law Conflict**

As a threshold matter, the Court determines that this case must be adjudicated under New Jersey law. Where jurisdiction is predicated on diversity of citizenship, a federal court must apply the choice-of-law rules of the forum state. *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012). In New York, courts use a "center of gravity" or "grouping of contacts" analysis in contract cases to establish which state has the most significant relationship to the transaction and the parties. *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317–18 (1994); *see also* Restatement (Second) of Conflict of Laws § 188 (laying out factors for determining governing law in absence of effective choice by parties). Courts consider the following non-exhaustive list of dispositive factors in this analysis: (1) the places of negotiation and performance, (2) the location of the subject matter, and (3) the domicile or place of business of the contracting parties. *Equis Corp. v. Mack-Cali Realty Corp.*, 6 A.D.3d 264, 266 (2004). Traditionally, "the heaviest weight in the instant grouping of contacts analysis should be accorded to the location of the property." *Id.* at 267.

Here, there is no dispute that the Properties are in New Jersey and that the underlying sale included both the real property and business assets. Bosque drove to New Jersey to negotiate his role in selling the Properties. Subsequently, he went to New Jersey to inspect the Properties,

7

conduct market analysis of similar businesses, and took at least three investors to view the Properties. LaFrieda's domicile and Emily Realty's place of business at the time were in New Jersey. Rosenburg's business entity, Emerald Realty, LLC, was also located in New Jersey. Ex. 2, Bosque's Counter-Statement of Facts ¶ 23, Doc. 33. The only connection to New York is that Bosque worked in New York and Tayyib Bosque Corp.'s principal place of business was in New York. While Bosque alleges that he advertised and negotiated from New York and was the point person in New York, the grouping of contacts clearly weighs more heavily in favor of New Jersey, as the real property and business assets are located there, and a substantial part of the negotiations, and in-person meetings about the sale occurred there. Additionally, New Jersey has a strong interest in regulating the acts of unlicensed brokers in the state. *Equis,* 6 A.D.3d at 266 (finding New Jersey had a stronger center of gravity as the property was in New Jersey and because New Jersey had a strong interest in regulating unlicensed brokers performing services in the state). Thus, New Jersey law governs this contract dispute.

## IV. NEW JERSEY STATUTE OF FRAUDS CLAIMS

LaFrieda argues the New Jersey Statute of Frauds, N.J.S.A. § 25:1-16(c), requires dismissal because it provides that a business broker's commission must be agreed to in writing, be signed by the seller or an authorized agent, and state the amount or rate of commission. LaFrieda alleges that Bosque was not licensed to sell the underlying real estate in New Jersey, and even if this Court disregards the Statute of Frauds, Bosque has failed to make out the elements of a New Jersey contract, quasi-contract, or fraud claim. Ex. 3, LaFrieda's Memo for Summary Judgment, Doc. 29.

**A. Business Brokers Do Not Need a License in New Jersey**

The Court first addresses whether Bosque acted as a real estate broker, a business broker, or a finder. This distinction is important for two reasons: first, because real estate brokers need to have a license to sell real property in New Jersey, and second, because unlike business brokers, finders get a commission when they find a buyer, whether the buyer closes the sale or not. Bosque characterizes himself as a "business-broker/finder." Amend. Compl. ¶ 29–31, Doc 30. A finder's responsibilities are limited to "finding, introducing and bringing the parties together for a deal which they themselves negotiate[] and consummate[]"; the finder is not involved in negotiating the price or any of the other terms of the transaction. *Cooney v. Ritter*, 939 F.2d 81, 84 (3d Cir. 1991). A business broker, on the other hand, is one who negotiates the purchase or sale of a business. N.J. Stat. Ann. § 25:1-16 (West). "Negotiates" means "identifies, provides information concerning, or procures an introduction to prospective parties, or assists in the negotiation or consummation of the transaction." *Id*. The New Jersey Statute of Frauds prohibits real estate brokers from purchasing and selling real estate without a license. *Id*. § 45:15. "Although the sale of a business frequently includes valuable real estate, the business broker concentrates on the transfer of the entire business." *Kazmer-Standish Consultants, Inc. v. Schoeffel Instruments Corp.*, 89 N.J. 286, 290, 293 (1982) (finding business brokers can only recover a commission on the business portion of the sale when it also includes real property).

The Court finds that the underlying transaction was inherently a business sale. Ex. 3, Bosque's Opposition 7, Doc. 33. The transaction involved the sale of three businesses, whose operation required managing a residential facility, hiring and firing employees, obtaining business licenses, handling the residents' money, among many other business operations. *Id*. at 8. Tellingly, potential buyers requested to inspect the financials of the Properties, including the

tax returns, P&L statements, and proof of the social security deposits. Ex. F, Text Messages ¶ 432, Doc. 29. Finally, the Agreement provided that LaFrieda was to sell and convey both the real property and business assets of these Properties. *E.g.*, Ex. 10, Signed Contract, Doc. 33.

Bosque claims that the Statute of Frauds does not apply to him because he acted as a finder and not a broker. Ex. 3, Bosque's Opposition 9, Doc. 33. The evidence before the Court proves the contrary. As Bosque himself asserts, "[f]inders merely find buyers, while brokers handle the transactions from A to Z, especially regarding negotiations." *Id*. at 8; *see also M. Dean Kaufman, Inc. v. Am. Mach. & Foundry Co.*, 102 N.J. Super. 1, 10 (App. Div. 1968), *aff'd sub nom. Dean Kaufman, Inc. v. Am. Mach. & Foundry Co.*, 54 N.J. 239 (1969) (distinguishing between "a finder (who finds, interests, introduces and brings the parties together for the deal which they themselves negotiate and consummate) and a broker (whose duty is to bring the parties to an agreement on his employer's terms)"). Here, Bosque acted as a business broker because he did more than simply bring LaFrieda and Rosenburg together; he played a major role in the negotiations. He did market analysis to come up with a sales price; negotiated an additional payment from Rosenburg of $50,000 to cut other buyers out of the deal; facilitated the negotiation of contract terms, like the closing timeline and whether the buyer could have a mortgage contingency; and managed the logistics of when the deposit and contract would be executed, etc. *See, e.g.*, Ex. 16, Email, Doc. 33 (Bosque says that he "accepted the offer" from Rosenburg on LaFrieda's behalf). Clearly, therefore, Bosque did not limit his actions to introducing LaFrieda and Rosenburg, instead he brought the parties to an agreement that followed LaFrieda's terms. Accordingly, the Statute of Frauds applies to Bosque as a business broker and he did not need a license to sell the Properties in New Jersey.

**B. Business Brokers Need to Get Their Commission Agreements in Writing**

Having determined that Bosque acted as a business broker, the Court next decides whether he had a valid contract with the Defendants. The New Jersey Statute of Fraud states that business brokers are entitled to a commission only if, before or after the sale of the business, "the authority of the broker is expressed or recognized in a writing signed by the seller or buyer or authorized agent, and the writing states either the amount or the rate of commission." N.J. Stat. Ann. § 25:1-16(c) (West). An electronic record can satisfy the writing requirement of the Statute of Frauds; an electronic signature similarly satisfies the requirement for a signature. *Id*. § 12A:12-7(c)–(d). The term "electronic signature" means "an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record." *Id.* § 12A:12-2. The electronic record or signature must comply with the Statute of Frauds.

To establish the existence of a valid contract, Bosque relies on a series of text message exchanges. LaFrieda authorized Bosque to perform services to sell the Properties, such as marketing, taking potential buyers to view the property, and facilitating the negotiations with the buyers and their attorneys. Bosque alleges that he and LaFrieda reached a written, binding fee agreement on March 23, 2016 as reflected in the following exchange:

| | |
|---|---|
| Text from Bosque: | I'm giving you a fee agreement for $550.. before you get contract I'm not stupid. $500 I earned $50 you owe me for the deal! |
| Text from LaFrieda: | Beat it. 500k. You owe me. |
| Text from Bosque: | Ok don't drive me crazy…. |

Ex. F, Text Messages ¶ 114–16, Doc. 29.  However, Bosque wanted $550,000 and the parties continued to negotiate whether Bosque's commission was $500,000 or $550,000 after this April 4, 2016 exchange.  Ex. F, Text Messages ¶ 192–93 (Bosque tells LaFrieda that he wants an extra $50,000 for telling Rosenburg he would cut other buyers out of the deal and LaFrieda tells him to "[b]eat it").  LaFrieda had stated on several text messages that the agreed commission amount was $500,000, for example on March 22, 2016, when he said:  "$500k like we agreed."  *Id*. ¶ 86.  Bosque eventually accepted that amount and tells LaFrieda "you owe[] me $500k."  *Id*. ¶¶ 448 (April 25, 2016), 556 (May 3, 2016).  The Court construes the facts in the light most favorable to Bosque, the non-moving party in finding that the parties agreed that the commission price was $500,000.

However, establishing a commission price, by itself, is not the same as forming a written, binding contract.  The Statute of Frauds requires Bosque to prove that LaFrieda signed the text messages.  An electronic record can be considered an adequate writing but only if it is signed. *See CAM Tr. v. Revere High Yield Fund, LP*, No. A-1250-17T3, 2018 WL 5810296, at *4 (N.J. Super. Ct. App. Div. Nov. 7, 2018) (finding emails were clearly "writings" when the defendant's representative ended the email by typing his name, title, and contact information); *cf. Debellis v. Hollahan*, No. CV 16-382 (RBK/AMD), 2017 WL 2482865, at *3 (D.N.J. June 8, 2017) (holding series of unsigned text message exchanges did not constitute a valid legal agreement). Here, however, Bosque merely defines an electronic signature as "an electronic process" but does not point to any text message signed by LaFrieda.  Ex. 3, 9, Doc. 33.  Accordingly, Bosque fails to establish a crucial element under the Statute of Frauds and did not have a valid commission contract.

Furthermore, even if this Court found that the Statute of Frauds did not bar Bosque's claims, he has failed to prove that he earned a commission on a sale that he did not cause. "Under New Jersey law, if a broker is to earn a commission for a transaction that she or he does not cause, the agreement must explicitly provide for it." *Starr*, 1994 WL 548209 at *11. Bosque argues, wrongly, that LaFrieda never indicated that a closing was required to earn the commission. Yet the contract clearly provided by both parties states, "Seller shall pay Broker at time of closing." Ex. 10, Signed Contract ¶ 11, Doc. 33. In Bosque's own words, if LaFrieda closed the deal then he owed Bosque $500,000, but if did not close, then LaFrieda would send the deposit back to Rosenburg and would owe Bosque nothing. Ex. F, Text Messages ¶ 448, Doc. 29 ("Listen, close the deal you owe me $500k my money. Don't close send deposit back you owe me nothing."). Bosque argues that he meant there was no fee due if the businesses were not sold *at all*, and since LaFrieda did close with a buyer Bosque is entitled to a commission. Ex. 3, Bosque's Opposition 11, Doc. 33. However, this argument does not follow because Bosque and LaFrieda did not have an agreement that explicitly provided for a commission on sales that Bosque did not cause, and Bosque was fully aware that LaFrieda was shopping the Properties with another broker.

Alternatively, Bosque alleges that he earned the commission when he fulfilled LaFrieda's two conditions of obtaining a deposit and signed contract from the buyer. *Id*. at 11–12; *see also* Ex. 17, Emails 13, Doc. 33 (Bosque writes that Rosenburg and LaFrieda had a "fully executed contract" and that he is "entitled to [his] fee which is $500k"). There is no dispute that Rosenburg sent LaFrieda a $250,000 deposit. However, LaFrieda questions the credibility of the contract which Bosque purports was signed by Rosenburg. Ex. 3, Reply Decl. of Joseph LaFrieda ¶ 4–5, Doc. 36. LaFrieda claims that he never saw a signed contract from Rosenburg

until the discovery phase of this case and that the document itself raises several concerns: it does not include a date or a witness signature, it is on a page that has a different color than the rest of the contract, and the orientation of the signature page is upside down. *Id*. Even if Bosque proved that he fulfilled these two conditions, "where a binding executory contract was not entered into between the seller and a buyer registered by the broker…, the broker has been denied a commission pursuant to the terms of the brokerage agreement." *Leadership Real Estate, Inc. v. Harper*, 271 N.J. Super. 152, 170 (Law. Div. 1993). Because LaFrieda and Rosenburg never entered into a fully executed contract, Bosque is not entitled to a commission.

## V. THE NEW JERSEY STATUTE OF FRAUDS BARS THE COMMON LAW CLAIMS

Defendants further seek summary judgment on Bosque's breach of contract, quantum meruit, unjust enrichment, and fraud claims under New Jersey common law. Ex. 3, LaFrieda's Motion for Summary Judgment 11, Doc. 29. "To prevail on a breach of contract claim under New Jersey law, a party must show the existence of a valid contract between the parties. *Ribble Co., Inc v. Burkert Fluid Control Sys.*, No. CV 15-6173, 2016 WL 6886869, at *2 (D.N.J. Nov. 22, 2016). Bosque does not have a valid contract under New Jersey law. A broker who cannot recover a commission directly from a seller due to the Statute of Frauds, cannot circumvent the statute by seeking to recover under quantum meruit or unjust enrichment theories. *Jeffrey Realty, Inc. v. Ventice*, No. A-0506-05T1, 2006 WL 3498207, at *4–5 (N.J. Super. Ct. App. Div. Dec. 6, 2006). Permitting a plaintiff to bring a quantum meruit or unjust enrichment action when the Statute of Frauds says they cannot recover a commission "would substantially undercut the law and its spirit." *McCann v. Biss*, 65 N.J. 301, 312 (1974). Bosque's fraud claim that LaFrieda entered the agreement with the intention of not honoring it, fails because the allegation arises from the same claims as the underlying contract dispute and thus does not state a cause of

14

action. *Vanguard Telecommunications, Inc. v. S. New England Tel. Co.*, 722 F. Supp. 1166, 1186 (D.N.J. 1989), *aff'd*, 900 F.2d 645 (3d Cir. 1990). Even when a seller makes misrepresentations, the broker cannot overcome the Statute of Frauds if they did not meet the requirement of a writing. *Louis Schlesinger Co. v. Wilson*, 22 N.J. 576, 585 (1956). Accordingly, all of Bosque's claims are barred by New Jersey law because he did not have a valid written agreement.

## VI. PIERCING THE CORPORATE VEIL

Finally, Bosque asks the Court to pierce the corporate veil. New York courts apply the law of the state of incorporation as it "has the greater interest in determining when and if that insulation is to be stripped away." *Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991). In Nevada, where Emily Realty was incorporated, "a party must prove by a preponderance of the evidence that the financial structure of the suspect corporation is only a sham and that it caused an injustice." *Goff ex rel. Estate of Torango v. Harrah's Operating Co.*, 392 F. Supp. 2d 1244, 1245 (D. Nev. 2005) (citations omitted).

Bosque asserts that LaFrieda was the only member of Emily Realty and co-mingled it's funds; he provides LaFrieda's Schedule E "Supplemental Income and Loss" tax schedules from 2013–2015, which lists all three Properties. Ex. 13, Doc. 33. Otherwise, Bosque only makes conclusory allegations, such as "[t]here are, or may be" grounds for piercing the corporate veil, Amend. Compl. ¶ 92, Doc. 30, and that "there is total domination of the company by defendant LaFrieda." Ex. 3, Bosque's Opposition 18, Doc. 33. Therefore, Bosque has not proven that this Court should exercise the extraordinary remedy of piercing the corporate veil.

## VII. CONCLUSION

For the reasons set forth above, LaFrieda's motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 29, and close the case.

It is SO ORDERED.

Dated: June 17, 2019
       New York, New York

                                              Edgardo Ramos, U.S.D.J.